May it please the Court, Sam Hartzell for Defendant Appellant Dmarcian Europe BV, which I will refer to here today as DBV. I will refer to the plaintiff as DINK. This case is about the terms and consequences of an oral agreement that DINK and DBV reached in the Netherlands in January 2016. Now, the plaintiff, DINK, was formed in 2014. And about a year later, DINK decided that it wanted to expand into the European market. DINK could have done that itself. It could have set up servers in Europe, hired personnel, set up an office. But it chose not to. Instead, it decided that it wanted to work with an established Dutch company. And so in January 2016, DINK's CEO traveled to the Netherlands where he agreed in person with DBV's manager on three things. And the terms, the precise terms of that agreement are in dispute. But the key facts, the ones that should drive this appeal, in our view, are undisputed. The first key fact is that an agreement was reached, and it was reached entirely in the Netherlands. The second key fact is that DINK authorized DBV, then known as Mailmerk, to change its official name to Demartian Europe BV, and to begin marketing and distributing so-called Demartian software in Europe under the name Demartian. And third, in exchange, DBV gave DINK, or its CEO at DINK's option, the right to become DBV's majority shareholder for nominal consideration, 1 euro. Now, these three facts, an agreement formed in the Netherlands about how a Dutch company would be governed and market its services abroad, established multiple compounding errors by the district court. Each of these errors builds upon the last. The first error that the district court made was by not dismissing DINK's complaint, both on personal jurisdiction and forum non-convenience grounds. Second, because the district court did not dismiss the complaint, it had to consider DINK's motion for a preliminary injunction. On the personal jurisdiction point, I thought that DBV, through Mr. Greenaway, had solicited business with DINK, and that they were the ones that initiated the business relationship to allow DBV to use the trademark and domain names. And I thought that that was the one that initiated that was DBV. I think Your Honor is referring to a 2013 email that one of DBV's indirect shareholders sent to a person who would later become DINK's CEO. But in 2013, there was no DINK. Plaintiff did not exist. And it's certainly the case that no agreement was reached in 2013. But to the broader point, DBV has never solicited anything in North Carolina, because what DBV does is operate out of Europe. But yes, but why isn't this just like a Burger King situation? Your client entered into an ongoing business relationship with an entity that you knew was in North Carolina, an ongoing continuous business relationship, licensing the software of a North Carolina-based company. Under Burger King, why isn't that enough to say you can hardly claim that we say personal jurisdiction has two components, right? Surprise and fairness, basically. And the idea that I can't possibly imagine that when we enter into an ongoing business relationship with a North Carolina-based company that we might someday wind up being sued in North Carolina. That just doesn't seem to really raise many personal jurisdiction hackles. Yes, Your Honor. And skipping past the long-arm statute, which I do think is an important part of this case. But hasn't the North Carolina Supreme Court said that's construed to exercise the full range of due process? Not under the subsections that were invoked here. Can you get the microphone closer to you, please? Yes, Your Honor. But I do want to answer the Burger King question. Yeah, why is it just Burger King? And that is the mere fact of a contract itself is not purposeful availment. It depends on the terms of that contract. So in Burger King, there was a written agreement where the franchisee accepted exacting regulation by the Florida Corporation and the written contract said it's going to be governed by Florida law. Here, the obligation that DBV had was solely to its majority shareholder, the person who would, whether it be Dink or Dink CEO. I think you're answering Judge Hyten's question. And as I understood Judge Hyten's question was that DBV knew that this was a North Carolina company and that it wanted a relationship with a North Carolina company. And how could the business relationship possibly be carried on without some, physical presence is not required, but without some contacts, calls, emails, etc. directed into North Carolina by DBV? I mean, this is a transatlantic business relationship and you're saying that it had nothing to do with North Carolina? The relationship itself did not. Dink certainly had many contacts with North Carolina, but Walden instructs that the analysis here is what is DBV's relationship. And the key distinction from Burger King is there the party entered a written agreement saying it will be governed by Florida law and they accepted an obligation to be sending payments to that company and to be regulated by it. Well, but DBV was the one with the relationship that the relationship is between DBV and Dink. And it just is. Dink is performing through DBV's request. This whole contract of cooperation grew and Dink performed a lot of services in North Carolina, customer services, marketing, technical support, and those were DBV's requests. There was much that emanated out of North Carolina to Europe where DBV was conducting its business and serving its customers. And the reciprocal obligation that was flowing back was unlike Burger King because there was nothing flowing back. Instead, what DBV was was obligated to its majority shareholder to whatever rights as a matter of Dutch law that shareholder has. But I do want to make sure that I emphasize that in our view the two clearest examples of error in the district court's rulings here is in the preliminary injunction and then the contempt calculation. And most predominantly in the preliminary injunction merits consideration. So as this court well knows, preliminary injunction is an extraordinary remedy. Plaintiff has to clearly establish its entitlement to relief. The district court focused primarily on the copyright claim and the trademark claim. Both of those claims should not have been subject to U.S. law under this court's And the reason for that is there's been no showing under the Lanham Act of any risk of confusion by U.S. consumers, much less substantial risk of confusion, which is what this court said in Nintendo. How could there not be a substantial risk of confusion given these similarities in the domain names? And all the district court's injunction did was to say issue a disclaimer and make sure that you point out that these two companies are different and issue a disclaimer that the trademark did not belong to it. That's all the district court did was to stop on a temporary put in place measures to stop what it found to be intellectual property violations. And isn't the district court due some deference? It's got the parties before it and isn't a preliminary injunction. It's an appealable order, admittedly, but the question here is whether the district court abused its discretion in issuing the preliminary injunction and the terms of the preliminary injunction. And also there's a finding of fact that underlies that because the district court found that DiMarchi and D. Inc. still owned the domain names and the branding and the logos, and we would have to find that the district court abused its discretion in the terms of the preliminary injunction and also that it was clearly erroneous in finding that Denmark, that D. Inc. owned the domain names and the intellectual property rights that were being transgressed. And so the standard of review here for fact finding and preliminary injunctions is something that you've got to come to terms with. Yes, Your Honor. And our argument is that no preliminary injunction should have been issued at all because the Lanham Act doesn't have extraterritorial application to the websites it issued. So you say that the Lanham Act doesn't have extraterritorial application, and I agree. I don't think that in the normal course of events that the Copyright Act and the Lanham Act apply extraterritorially. But here you are talking about a transatlantic business relationship, an ongoing business relationship, and the nature of the injury is that DBV is using DNC software to service American companies, and a lot of the injuries have been sustained by D. Inc. in the United States and as a result of what DBV has been doing. And so I'm wondering if the presumption against extraterritorial application, which I understand is there and everything, but where you've got an ongoing business relationship, isn't an American company able to protect its legitimate business rights in an American court under American law? And those are just some questions that I have. And I'm saying that if there are cases where the presumption against extraterritoriality does not apply, it would be an ongoing transatlantic relationship, would it not? The problem here, Your Honor, is that there's no evidence, zero, that any person in the United States visited any of these foreign URLs. For example, demartian.nl. There is no evidence that any person in the United States became confused by trademark usage. Well, no, that's not right, because what about the injury that was pointed to? Clarison, which was a California company, was migrated to DBV's platform and others, and there were all sorts of consumers here that made inquiries as to what was going on. The evidence in the record, Your Honor, page 1166, is that Clarison's Israeli employee is the one who is working with DBV. And the only inquiry from a consumer is a person who posted under the name, I'm wearing a towel, and there is no evidence whatsoever where that person is located, except that person quoted an email that was sent to DBV's customers. And because DBV only has customers abroad, the inference is that it was a foreign customer. It certainly was not clearly established that it was an American customer. But to answer Your Honor's question about injury, I do believe there is evidence in the record that Dink may have lost sales that it wanted to make in violation of the parties' agreement abroad. But tire engineering squarely forecloses the idea that a U.S. company can proceed under the Lanham Act merely because it lost sales abroad. But you are using DNC software. DBV is using DNC software, not its own software, but software that the district court found Dink still owned. And DBV is using that software to service its American companies and to drain business from DNC by capitalizing on the confusing similarities of the domain names. And the domain names are very, very much alike. We strongly disagree that it's Dink's software, and we strongly disagree that Dink has any U.S. customer. The DBV, excuse me, has any U.S. customer. It does, and it has Israeli customers. But the point I want to make briefly, I see my time is coming to a close, is under the Copyright Act, what has to be shown here is a predicate act of infringement. As the D.C. Circuit said in the I.M.A. pizza case, this is not a partial act test. It is a predicate act. It has to be a completed act of infringement that happened in the United States. No infringement happened in the United States. At most, even if one assumes that DBV serviced a U.S. company Clarison, the only thing that Dink would be able to proceed on is a theory of damages flowing from that single interaction. The injunction goes underwater. They were using DNC, the Dink software, to service their American companies and to draw business from Dink, and that is an act of infringement. May I respond, Your Honor? Yes. The evidence is that a piece of code, a RUA, associated with a Clarison website, was pointed at DBV's service. The only evidence about who did that, who actually accessed DBV's services, is that it was an Israeli employee, and there's no evidence. But what about the district court's findings that Dink owns the domain names and the branding and the logos, and that there was an injury and that there was an infringement in the United States, and aren't those findings due some deference? Aren't they factual in nature? Well, the court said it was recounting those facts in the light most favorable to Dink, but the reason those facts are erroneous, Your Honor, is because the district court improperly assumed that Dink had the right to terminate the January 2016 agreement. So to back up, Dink authorized DBV to use this name to distribute this software, and it did so in the Netherlands, and as a matter of choice of law, federal court, diversity, North Carolina, Dutch law governs. And so it was incumbent on Dink to clearly explain as a matter of Dutch law why it could terminate this arrangement. Well, I guess the breach of contract claim and the cooperation agreement is before the Dutch court, but that's a different question from the ownership of the domain names and whether there are intellectual breaches of intellectual property, the work to the detriment of DNC's business in the United States. It seems to me that the intellectual property dimensions of this case are simply different from the question before the Dutch court, which was who breached the cooperation agreement or whether there was contractual breach, but you can take that up in your rebuttal, okay? Thank you, Your Honor. May it please the court, my name is Pamela Duffy, and along with my colleague David Dorey, we represent the plaintiff Demartian in this matter, and we'll be addressing the issues of personal jurisdiction and form nonconvenience in the motion to strike if the court has any questions about that, and Mr. Dorey will be addressing the remainder of those issues. Well, the issues of personal jurisdiction overlap to an extent with the questions of intellectual property. I mean, there's an interlocking character to those claims, don't you think? I think that there is an overlap between the concepts of personal jurisdiction and extraterritorial reach of the injunction. Not complete, not complete, but partial. Partially, partially, and I think so. The question of personal jurisdiction goes, of course, to whether the court had authority to enter an injunction at all, and then the question of extraterritorial reach deals with the question of how far that injunction can reach, and Mr. Dorey will be dealing with the question of the extraterritorial reach. So if I may, I'd like to focus on the personal jurisdiction first. It's our position that this was a relationship that was anchored in North Carolina, that this was a contract of cooperation that grew out of Mr. Grunewig's initial contact in reaching into North Carolina to seek the services that ultimately became the party's joint business. And that ultimately led to a contract. I think that there's a lot of dispute about how and where and what the terms of the contract are, other than clearly the IP in this case was intended for the party's joint use. And what brings us here today in this case is that the defendant has taken this IP and outside that contract of cooperation and misappropriated it for its own use. And that's what our claims grow out of, which is, again, different from the Dutch cases that I'll talk about on the forum on convenience. But the Dutch case, the case before the Dutch court, is a very different one, is it not? It's absolutely very different, Your Honor. I mean, one's a breach of contract case, and the district court was careful not to dive into that. But the case before us concerns the district court's findings that claims that there was piracy of intellectual property, and it was used in a very deliberate sense to damage this American company's business in every way. I completely agree, Your Honor. The Dutch case was a very limited one. It was interim relief only, as was pending at the time this injunction was issued. And it dealt with issues of access to the system, because our client had terminated the contract in January. That action was initiated, and our client resumed access, continued that through March until the defendant took a bootleg platform and began using the IP outside the scope of the party's contract of cooperation. So we completely agree that the Dutch cases are a very different matter. Well, Stuffy, can I ask you, what is the status of the Dutch litigation? The status of the Dutch litigation is that it is ongoing. Another action on the merits was filed sometime after this, I want to say in October, but certainly after the injunction issued. And that is proceeding, and it's still not squarely the same as what's before this court in terms of the scope of the IPS. Can I ask you this? I apologize, this may be a question better suited to your colleague. So you're very careful to say that what you're accusing them of doing is outside of the contract. Now, the problem is they don't agree that it's outside of the contract. But let me take a step back and ask you, can I commit copyright infringement or trademark infringement or patent infringement against you if you've given me a license to use your IP? So I think what is at issue here is the scope of the license, and I don't know that DBV is really saying that they had a license to do whatever they wanted to do. Sure, but just to take a step back at a high level of generality, if a plaintiff sues a defendant for copyright infringement and a defendant says, I totally agree that was your copyrighted material and I totally agree that I used it, but here is a license in which you let me use your copyrighted material, you have no copyright infringement claim, right? In that situation, I'm not asking you to concede away your case here. I agree. I think that if it's like an unlimited license to do whatever you want with it, I would agree, but that's not the case. Okay, and you agree that's true of trademark? I'm sorry? You agree that's true of trademark? I can also license my trademark to someone else? One could grant an unlimited license of a trademark. And you agree that's true of trade secrets? I can license, I can give someone permission to use my trade secrets. One can give permission to use trade secrets, but what's at issue here is what was the agreement and what was the scope of the license? Well, so this is candidly the real concern I have about the district court's injunction, which is so I understand your claiming that everything they're doing is outside the contract, the contract was terminated, the contract didn't let them do this. I understand those are all of your arguments, but their arguments are that's not true. And so when I read the district court's opinion, my concern is I never see the district court saying what the terms of the contract were, whether it was governed by Dutch law, which to me it seems pretty obvious. I mean, I'd be prepared to be persuaded otherwise, but it seems obvious to me this underlying agreement is governed by Dutch law. But I guess what I'm saying is I don't know how you can conclude that the plaintiffs are likely to succeed on the merits of any of their IP claims without first establishing what the terms of the license were and what particularly the rules for terminating that license were. And when I read the district court's opinion, I don't see anything about the underlying agreement. And I don't know how you can resolve the copyright claims in this case or the trademark claims or the trade secret claims without first concluding the agreement didn't authorize this. So I think that there are a lot of disputes about the exact terms of the contract, but I believe that the district court did address the fact that whatever the total scope of the contract terms were, what is undisputed is that the parties entered into this license pursuant to the contract of cooperation and that it was intended for their joint use. And these were companies that ultimately were intended to merge down the road. So whatever the total scope of the terms were, I don't think that's pivotal to the injunction. But how? Because I know your client's argument is, well, that contract of cooperation is kaput because we terminated it. But then I understand their argument to be, under Dutch law, you can't just terminate this contract just because you want to. And again, I don't know if that's right or wrong as a matter of Dutch law. I have no idea what Dutch contract law says. But what I am troubled by is that I don't see the district court grappling with any of these questions, which strike me as absolutely indispensable to concluding that you have a likelihood of success in the merits. So I think that the issue is not whether we terminated it and whether there was a right to use it after termination. I think the issue is, regardless of what the circumstances were, could they use it outside the contract of cooperation? And I know you assert that's what they're doing, but they assert that's not what they're doing. Actually, I think that their position is that they're entitled to proceed on their own in their own business, and there's no question that that's what they've done. Their business is now completely separate from ours. And in the course of this, to avoid the injunction's disclaimer requirements, they've, in fact, renamed. And what they're doing is they're using our platform under their new name. But there's no question that they're operating independently of ours, and there's no question that that's outside the contract of cooperation. And that is probably the one undisputed issue in terms of what the contract terms are. And I see that I'm out of time, so I would turn it over to Mr. Dorey. All right. Good morning, and may it please the Court. David Dorey from Blank Room in Wilmington, Delaware, with my colleague Pam Duffy for Demartian. Let me get directly to your question, Your Honor. Basically, the terms of the contract and the determination of what they are don't matter here because, quite simply, they're taking the position that, hey, you didn't allow me access to your platform, so you made me do this. You made me exercise self-help. You made me take the stuff you gave me access to for our joint purpose, solely for that purpose. Why else would we expose any of that, especially when Mr. Dragan owned 51% of the company? And as we said at the trial level, and the Court noted in referring to the tattoo case, whatever the scope of the license was, it ain't this. Excuse my language, but that's the point. But how do I know that? Because they don't disagree. Well, no, I'm not sure they don't disagree. So that's, I guess, fundamentally the problem is. We have this incredibly consequential business agreement that was created by a completely unwritten agreement, and now we're supposed to figure out what the terms of... And now, of course, it's broken down, and you both blame... I'm not casting this... You both blame each other for the fact that it totally broke down, and we're supposed to try to figure out what the terms of an unwritten agreement that was entered into in the Netherlands many years ago did and didn't allow. And your argument is, this is an agreement of cooperation, the cooperation is broken down, so now we just have to go our separate ways. But for all I know, their argument is that under Dutch contract law, that's just not true. That maybe under Dutch contract law, they're allowed to exercise self-help. And I don't know the answer to any of those questions. Respectfully, they've not made that argument. And if they did, they would have come in here and said, I had every right to use those domain names. I had every right to use the trademark. They've not told you that. They've only argued extraterritoriality. The only reason they even challenged the copyright at the trial level was because they claimed to have contributed to a modification of it or continuing use of it in the business. They don't deny we own the original copyright. Demartian owns the original copyright. I can address their copyright registration piece, which was not raised at the trial level. But if I need to do that, you can ask me to do that. But my point is, however you look at this contract, here's the way you have to look at it. You have to appreciate the big picture. Here's the big picture. We operate a business jointly together with them for our common purposes. We let them in and let them have access to everything. All they did was handle the sales. And this goes to the other question on jurisdiction. We gave them the right to handle the European offices of our American companies. We put that on our website. We were trusted by the American companies. And when they send out 15,000 data breach notices to the American companies, their European instances, telling them that we're violating their data, you don't think that reaches the United States because it's their companies? But that's a side point. The critical piece I want to make is, when you look at this business and you say, how did Demartian achieve the level of success and business and attraction that brought these companies to us? And they did it through the program. They did it through their brand. They did it through training videos by Mr. Dragan. They did it through their customer relationships, their likenesses, their identities. And what they did was lift that entire thing, all of it, from a server and stuck it on their own to use it as they wish. So you had two people, remember the scope of what we were advertising to, the entire world. They didn't change a thing. We're going to the entire world. They want you to believe we're stuck in Europe. We're only staying within our boundaries or Africa or whatever this territory is. But think about that for a second. They literally, they didn't clone it, they took it. They literally took it and said to the world, we are them. And they had a little Europe under the end, which is what we were using before. So my point to you is, excuse me for getting a little enthusiastic, when you look at the terms of the contract, you have to find that somewhere there was an agreement, excuse me, if you're concerned about that, there has to be evidence in the record here somewhere that they didn't even argue. Well, no, wait, hold on, hold on. You're the plaintiff. You're the one that's seeking the extraordinary equitable remedy of a preliminary injunction. Not them. Right. So why don't you have to show me that they're not allowed to do this to get a preliminary injunction? Because I think their conduct in this case and the way they've handled this case, their conduct in responding to the injunction and the like, it makes it crystal clear that whatever license they had, it did not involve their right to take what they know are unchallengeable intellectual property rights. They admit, and I'll give you the page numbers, at 785, paragraph 10, Mr. Groeneweg admitted that they had a license, that we gave them a license for the software. And JA228 is the Dutch court said that the parties agree there was a license from us to them. That's how this whole thing started out. So no matter what the terms are.  Oh, in this case it would be, we would demonstrate, we gave them the permission to use this, so being here for the basis, and we're not here on breach of contract grounds, we're here on the other grounds, would be our burden to demonstrate that whatever license or permission they were given, this went way beyond that. And that's the reason we filed a suit as we did. But the basic point is that there is not a license to commit these, to do what they did with the software. It doesn't exist. And if it did exist, it would have been put into the record. If there was a license to utilize this, it would be somewhere in the record, right? It would, Your Honor. And they would, and they have the burden with the establishment of the intellectual property rights to establish that they had a right to either infringe on our rights, excuse me, that's the wrong way to say it, they had a right to use our intellectual property in a way that was permissible to us. But that would not have been that difficult if there is a license, and at least in all the litigation I've been aware of, if somebody has a license to use something in a certain way, and there's litigation over that, and if somebody has that license, that license generally in a written form, but it would be introduced into the record before the court. Understood. Do you see what my problem is? I can't find the license that allows them to do this. But we all agree, but you agree there was a license at some point, right? Yes, that's how we gave them access to all of our intellectual property. We wouldn't have done it if we trusted them to use it for our joint cooperation. And keep in mind, the Dutch case pending at the time... And we also agree that that license was never written down. There's arguments related to whether it is a writing based upon the exchange of e-mails and the like. But it's not you... It's not a tidy one. I agree with that. And at the time, there was an enterprise court. The proceeding at the time was an enterprise chamber proceeding in Dutch, which is basically an intra-corporate governance thing. It was between the shareholders. Demartian wasn't even a party to that. But to get to your point, they say you have to determine whether we validly terminated or not. Ask yourself, if that's the case, then what? If we validly terminated, you can't do what you're doing now. If you didn't validly terminate it, can you do what you're doing now? They're not saying that. They're not saying we can do this independent of Demartian. They made a decision to go on and go into competition with us. It goes from cooperation to competition. And there is no dispute that the parties work together. The dispute arose because there were starting to be some issues about whose license... What do you say the license should have indicated? In this instance, a valid license would be a license to use the domain name and to use the D-Inc. software in the United States. Is that correct? Yes. And it would be a license, you said the domain name, where the trademark is prominently featured, of course. And you say that's the license, that's what they were doing, and that there's no license to do that. And if there were a license to do that, it would be submitted into evidence. That's correct. And if you look at what they did during the time the contract was in place, we were working together with the same Demartian pieces and the domain name and the trademarks and the software. So we did it, and the only way they could have done it was to be allowed to be given the access by us. And the only claim, Your Honor, and this is key, when you go look at these terms of this contract, they're not claiming they have a right to the copyright by license. They're claiming they have a right to the copyright because they contributed to it, which Chief Judge Reitinger looked at and dismissed. He weighed the evidence and accepted Tim Dragan's declarations and the like, that, hey, I control this entire thing. He also, and I want to be clear about this, at the trial level, we also told them that the registered code was the code at the time. And if you look in this particular case, that Mr. Dragan's declaration, paragraph 21 of JA 1079, he said the platform they're using is a copy of our copyright registered code. And Ms. Duffy at JA 999, lines 7 to 10, told the court below, this version 1 versus 2 stuff doesn't matter. The copyright that was issued was issued on the current version. But the interesting thing is their argument has been focused, and I think you learn a good bit about the position of a party from the way in which the priority is given to certain arguments. And their argument is focused upon personal jurisdiction, and their argument is focused upon extraterritoriality. But the difficulty that I was having, and it's not that they don't have a license to do anything. It's not that they don't have, that there wasn't a cooperation agreement that gave them a license to do something. It's just that the license to use domain names, de-inks domain names and logos and branding in the United States, to take de-inks business and to get, by virtue of confusion, de-inks business shifted over to DBV. And you say, and the district court is due some deference on this point. You're saying that whatever there's a license to do, there's not a license to do that. Am I correct in that, is what you're driving at? That's exactly right, Your Honor. And Chief Judge Reitinger was very careful when he issued the restraints. He was very careful to allow the Dutch process to proceed. You've read the opinion related to whether they should have exposed this opinion. He was careful to say, and he could have said you can't do this business at all. He gave them the right to do it under certain terms. Can I just ask you a question about the contempt order? Pardon me? Can I ask you about the contempt order? Yes. I cannot for the life of me see how this $335,000 is possibly civil contempt. Because it's not coercive and I don't see how it's compensatory. Would you like to try to persuade me that I'm wrong about that? You'll be pleased to know that there's a clear explanation for that. Great. As Chief Judge Reitinger indicated, he based it and he said it twice. He said it in his original ruling and then the subsequent ruling. It was based on the business income and the financial performance of the companies. In the record, and cited in their reply brief in that respect, is an indication that from 2020 to 2021, 3.7 million euros in income. And by the way, they withheld more specific financial information. So you didn't have a full record on their fault. That said, you have a factual determination where is there anything in the record to back up what Chief Judge Reitinger said. And from 2020 to April of 2021, no injunction. Most of which was the contract of cooperation. 3.7 million euros was earned by DBV. All of it. Every single bit of it was earned on the Demartian URL, the Demartian name, the Demartian copyright. Without the Demartian trademark, none of that is earned. Period. What was the contempt for? Violation of the trademark by using the trademark in the URLs. Which, by the way, they say they don't control, but they controlled exactly where people went once they clicked that. But my point is, if he's basing it on financial information in that record, the 335, and you took... It just says 5,000 a day. Where does 5,000 a day come from? I think, keep in mind, he noted that there were at least nine, I think it may have been 11, individual violations. We cite the... But where does 5,000 a day come from? $5,000 a day can be rationally related to $10,000 a day in income for that 3.7 million euro, whatever the conversion rate is. I think they said it was a little over $9,000. Over that time frame, when all of it, every last bit of it, was earned based on the same violation that they committed in the contempt order. So there is definitely a tie, and we use the statutory damages as a sanity check. If you go with $100,000 each and you got 9 or 11, however many you choose, you're over a million dollars. It's still well within it. The worst that happens is a remand to take a look at that. We don't think that's justified because the court said, as opposed to, Your Honor, Judge Wilkinson and Bradley and Comer and the other cases, it was clear that he laid out rationale and said, this is what I'm connecting this to. The coercive part, I'll finish with this point. This is the unseemly part of what bothers me here. It's unseemly to say the injunction says the URL, use of the trademark in the URL, is almost the worst thing you can do in terms of infringement. And then the other side goes and says, I don't interpret his injunction as prohibiting that. I can't fit it in a thing, although they could have put it on the site. And then you go on and you say, when we give him three letters, all within five, seven, 14 days, telling him they're doing it, he says, no, no, and say, we'll wait for an advisory opinion from the court. If he doesn't like what we're doing, I'll tell you what, we'll stop. Hey, client, I'll tell you what, let's have the hearing. If it doesn't go well, he won't have an opinion for at least two weeks. We'll shut it down, and then there's no coercive impact. Counsel, I want to just, again, want to make sure that I understand what you're saying. That it doesn't, the question here is the scope of any license or the scope of any permission. You're not denying that there was an agreement between these two parties and that the agreement, like every agreement, gives certain contractual rights to one party and certain contractual rights to another. But your point is, as I understand it, that irrespective of the rights that the agreement, as a result of the negotiations conferred on one party or another, there was simply not a license to profit off the confusion between the similarity of these domain names and to use and to reach into the United States and to utilize that confusion to try to lure away this company's American customers and to try to destroy the nature of its business as a guardian of secured data. As the district court found, and there's got to be some deference paid to that, there just wasn't a license to engage in that. The district court was pretty narrow in its view. It wasn't going whole hog, but what it's saying is that I can't find in the record a license to do what you did. You're bad actors. You're trying to profit off this confusion and you don't have the authority that I see and that's put before me in the record to do what you did. It's piracy and the question is whether an American company has a right to enforce its legitimate business interests in this country in an American court of law. That's what we're talking about. As far as I'm able to see it, and I plenty of times have sided with foreign nations in these kind of disputes, but this one bothers me because I think the district court found they were bad actors in this respect and the district court is entitled to some deference in that finding. But if you have a different argument, let me know. That's the way I was coming at it. I apologize, I'm out of time. If I may make two very brief points to address Your Honor's point. Number one, understand this. All the evidence of the confusion and all that, until they lifted all this business and went on their own, nobody knew that there was anything else they were supposed to switch to. The only way anybody knows anything about any of this is because they had to tell them. They did it directly with the data breach. They did it indirectly by copying the website and advertising to the world. So that's a critical point. Nothing that people know about and the inference that it arise from could have ever come from anybody but them originating. And second, with respect to the license, just look at the conduct of the business from 16 until the time it changed. Just look at that. That's clear in the evidence and nobody disputes how that business was conducted. They were servicing the European customers. Forget the exclusive part. They were servicing the European customers on our platform. And it was never contemplated, and nor do they assert that the violation of the termination agreement, the improper termination agreement, gave them the right to abrogate intellectual property rights that they don't challenge here, except down at the trial level with respect to the copyright-based solely on contribution. Those are the two points I would make, Your Honor, to address. I agree with Your Honor's assessment. Let's hear from Mr. Hartzell and Roboto. Your Honor, in the limited time I have left, I would emphasize that our strongest argument on the merits is that we were given a license to do exactly what DB did here, to cooperate with Dink. Your Honor asked for where that is in the record. I agree it would be better if it were in writing, the license agreement. And, indeed, that is why the parties asked the Enterprise Court to order an investigation. But the two places that I would point Your Honor to. But something like this involving the amount of money and these are sophisticated business parties. If you had a license to do this, this would have been put in the record. These are not naive parties. These kinds of things, these kinds of licenses are memorialized. They are companies far smaller. The little mom-and-pop companies, that if they're going to use intellectual property, they get a license to do so. And the license is submitted into the record and it is memorialized in writing. And you were very candid, and I appreciate it. But you say it would have been better to have put that written license into the record. Well, yeah, you think? I mean, it would have been a whole lot better in terms of what is just ordinary business practice. And that's why the district court had a problem with it. But go ahead. I don't want to take up your time. Your Honor, the places in the record where you can find evidence of the license are page 596, where the court-appointed independent director describes his findings, the scope of the license, and page 785, where the person who was there negotiating that license testifies about it. But Dink chose to come to Europe and enter into an oral agreement rather than a written agreement. And that means that Dink had to respect Dutch law on this issue. Before this case even began, a Dutch court, the court of Rotterdam, had ordered Dink to continue performing the agreement. It is when Dink said no, refused to comply with that Dutch ruling, and DBV, by contrast, complied with the U.S. ruling, that's where the schism happened. But if you wanted to do what you did, you would have had a business license just to protect yourself. You would have had a business license, and it would have been in writing. It would have been better if it were in writing, Your Honor. Wouldn't your position have been hugely improved if that kind of document had been put into the record? Yes, but the document does not exist because Dink chose to enter into an oral license with DBV. And whether that oral license is sufficient... But it's your obligation to protect your own business interests by getting a doggone license. And the conversation we're having right now is one that should be had under Dutch law. What happens when a company enters into an oral license, giving them the right to do something, and one party says, you know what, I'm pulling out of it. Can you pull out of it in that way? The Dutch courts repeatedly said no. JA 643 affirmed. JA 1415. On something like this, the statute of frauds would almost seem to enter because a statute of frauds says, look, there are certain things that just don't fly under an oral contract. You've got to reduce it to writing. And the things that a statute of frauds covers are of far lesser significance than something as substantial as this. Do you know if the Netherlands has a statute of frauds? I don't know if the Netherlands has a statute of frauds. Neither do I. More importantly, I don't know what the district court's view on this is. I don't know if the district court found that there was no contract, if it said that it was terminable at will, if it found that DBV somehow forfeited any license it had by complying with the U.S. injunction the way that it did. All of these issues are issues for the Dutch courts to resolve. And again, they've already resolved them. The problem we have is that DINK is just refusing to comply with the Dutch injunctions where there's an asymmetry because DBV is complying. My final point I'd make, Your Honor, is you are absolutely right about the way that the penalty was calculated here. The district court fashioned a coercive $5,000-a-day fine that ended up not being needed because DBV had already ceased the contract. Well, that may be a different question from the question of the actual injunction and whatever. But the whole civil contempt, or as you put it, criminal contempt order, that may be a different question. Thank you, Your Honor. For the reasons we put in our brief, we ask that you reverse the motion to dismiss ruling. And for the reasons we've emphasized here today, the preliminary injunction should not have issued because the district court assumed a right to terminate the central contract and because U.S. law does not apply to the way DBV services customers abroad, even if those services have a connection themselves to the United States. Thank you. All right, we thank you. And we will adjourn court until tomorrow morning. Dishonorable Court stands adjourned until tomorrow morning. God save the United States and dishonorable court.
judges: J. Harvie Wilkinson III, Toby J. Heytens, Henry E. Hudson